737 A.2d 330 (1999)
Gerald J. LaVALLE and Richard A. Kasunic, individually and in their capacities as elected members of the Senate of the General Assembly of Pennsylvania, Petitioners,
v.
OFFICE OF GENERAL COUNSEL OF the COMMONWEALTH of Pennsylvania, Respondent.
Commonwealth Court of Pennsylvania.
Argued April 14, 1999.
Decided August 18, 1999.
Jeffrey Foreman, Harrisburg, for petitioners.
Roger E. Grimaldi and Sandra W. Stoner, Harrisburg, for respondent.
*331 Before COLINS, President Judge, and DOYLE, J., McGINLEY, J., SMITH, J., FRIEDMAN, J., KELLEY, J. and LEADBETTER, J.
COLINS, President Judge.
The present case is an appeal pursuant to what is commonly known as the Right-to-Know Act (Act)[1] filed by Gerald L. LaValle and Richard A. Kasunic (Petitioners), seeking access to certain documents in the possession of the Office of General Counsel.[2]
In 1993, Envirotest Partners entered into a contract with DOT to perform centralized automobile emission testing. In November 1994, after suspension of this emissions program by the General Assembly, DOT unilaterally cancelled the contract. As a result, Envirotest commenced a lawsuit in Commonwealth Court and the Board of Claims in May 1995. In preparation for defending the suit, the Office of General Counsel and DOT hired Ernst & Young LLP to prepare a report concerning damages and costs sustained by Envirotest. In December 1995, litigation ended and the parties reached a settlement. The Governor was authorized by the General Assembly to use state funds for payment of any settlements and/or court-ordered fines that resulted from legal action related to any DOT contract for centralized emission inspections entered into prior to November 16, 1994. After debating the settlement and funding authorization, the General Assembly subsequently authorized the expenditures by enacting Act 1995-72.[3]
Two years later, in December of 1997 and February of 1998, Senator LaValle and Senator Kasunic asked General Counsel for a copy of the Ernst & Young report. On February 27, 1998, General Counsel refused to provide Senator LaValle with the report on the grounds that the report was: (1) not a public record; (2) privileged under the work product doctrine; and (3) within the "investigations" exception from disclosure.
On March 30, 1998, LaValle and Kasunic filed a petition for review in Commonwealth Court seeking relief in both the Court's appellate and original jurisdictions. The Office of General Counsel and DOT filed an application seeking: (1) to quash the petition for improper service; (2) to dismiss the petition under this Court's original jurisdiction; and (3) to dismiss DOT as a party. Thereafter, LaValle and Kasunic cured the defect in service. On May 15, 1998, Senior Judge Warren G. Morgan of this Court issued an order dismissing DOT as a party and dismissing the petition for review insofar as it sought to invoke this Court's original jurisdiction, leaving only the Right-to-Know appeal from General Counsel's denial of Petitioners' request.[4]
The term, "public record," is defined in Section 1(2) of the Act as follows:
Any account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges or immunities, duties or obligations of any person or group of persons:
*332 Our Supreme Court has observed that there are two distinct categories of "public records" under the Act: (1) accounts, vouchers, or contracts dealing with fiscal aspects of government, and (2) minutes, orders, or decisions fixing the personal or property rights of a person or group of persons. North Hills News Record v. Town of McCandless, 555 Pa. 51, 722 A.2d 1037 (1999). The Supreme Court concluded that the first category, i.e., documents "dealing with" the receipt or disbursement of funds, should be broadly construed, whereas the second category, documents "fixing" the rights of persons, was intended to a "somewhat narrower construct." Id. at 54-55, 722 A.2d at 1038.
Petitioners in the present case argue that the documents fall within the first category, while respondents contend that they do not. In Sapp Roofing Co. v. Sheet Metal Workers' International, 552 Pa. 105, 713 A.2d 627 (1998), a plurality of the Supreme Court concluded that a private contractor's payroll records in the possession of a school district for work performed pursuant to a contract with the district constituted a "public record." The Court reached this conclusion after determining that the records were an "account" dealing with the disbursement of funds by the district.[5] Justice Saylor, writing for a unanimous Court in North Hills, stated that
Implicit in the Court's decision in Sapp Roofing is the conclusion that the accounts/vouchers/contracts category of public records reaches some range of records beyond those which on their face constitute actual accounts, vouchers or contracts. Nevertheless, it is clear from Sapp Roofing that, to constitute a public record, the material at issue must bear a sufficient connection to fiscally related accounts, vouchers or contracts.
555 Pa. at 55, 722 A.2d at 1039.
These recent pronouncements by our Supreme Court are considerably more expansive than this Court's earlier definition of an "account" as "a record of debit and credit entries to cover transactions during a fiscal period of time and ... not... a statement of facts or events." Butera v. Office of the Budget, 29 Pa.Cmwlth. 343, 370 A.2d 1248, 1249 (1977). Since it is now clear that an "account" is to be broadly construed, and need only constitute "records evidencing disbursement," we must conclude that the Butera definition no longer accurately states the law of this Commonwealth. Accordingly, Butera is overruled to the extent that it conflicts with the recent decisions of our Supreme Court.
The Ernst & Young report did not reflect any actual disbursement of funds by the Commonwealth, but was commissioned for the express purpose of determining the extent of Envirotest's damages. Clearly, this would not meet the traditional definition of "account" as stated in Butera. The "accounts" category as more recently defined, however, "reaches some range of records beyond those which on their face constitute actual accounts, vouchers or contracts." North Hills, 555 Pa. at 55-56, 722 A.2d at 1039. Despite the broader meaning accorded by the Supreme Court, however, the requested material must still "bear a sufficient connection" to fiscally related accounts, Id. at 55, 722 A.2d at 1039, and must "constitute an essential component of an agency decision." Sapp Roofing, 552 Pa. at 110, 713 A.2d at 629 (citations omitted).
The Ernst & Young report was an audit of the materials submitted to the Commonwealth by Envirotest requesting payment for breach of contract. It was, therefore, in some ways similar to the private contractor's payroll records at issue in Sapp Roofing, which, pursuant to the Pennsylvania Prevailing Wage Act,[6] *333 were submitted by the contractor prior to disbursement of final payment on the contract. This similarity alone, however, does not transform the audit into a public record. In Sapp Roofing, regulations implementing the Prevailing Wage Act required the agency to ensure that all wages due to workers by the contractor are paid, and to withhold the amount of unpaid wages from disbursements to the contractor. 552 Pa. at 110, 713 A.2d at 629. Thus, the private contractor's records were an "essential component" of the agency's decision, since a mandatory statutory duty could be performed only after a review of those records. In the present case, the Ernst & Young audit was not required by statute or regulation, and the Office of General Counsel was not obliged to act in any way upon the audit. Accordingly, we conclude that the audit, while tangentially relating to disbursements by the Commonwealth, was not an "essential component" of the decision to pay Envirotest and, as such, is not a "public record" under the Right-to-Know Act.[7]
Accordingly, General Counsel's decision to deny petitioners access to the Ernst & Young audit is AFFIRMED.

O R D E R
AND NOW, this 18th day of August, 1999, the decision of the Office of General Counsel of the Commonwealth of Pennsylvania to deny Petitioners' request for access to the Ernst & Young report is AFFIRMED.
Judge SMITH dissents.
Concurring and dissenting opinion by Judge KELLEY.
KELLEY, Judge, concurring and dissenting.
I concur in the majority's overruling of Butera v. Office of the Budget, 29 Pa. Cmwlth. 343, 370 A.2d 1248 (1977) to the extent that it conflicts with the recent decisions of our Supreme Court. I dissent, however, with respect to the majority's conclusion that the report generated by Ernst & Young is not a public record under the Right to Know Act[1] because it was not an essential component of the decision to pay Envirotest Partners. In my opinion, the Ernst & Young report was an essential component and therefore constitutes a public record.
The Office of General Counsel admittedly relied upon the Ernst & Young audit to determine the extent of Envirotest's damages. In effect, the report was the justification for Envirotest's damages and the decision to pay Envirotest approximately $145 million plus interest from public funds.[2]
In order to pay Envirotest from the public coffers, the General Assembly was called upon to pass legislation. This legislation authorized the Governor to transfer funds from the Catastrophic Loss Benefits Continuation Fund and funds from continuing appropriations for hazardous waste *334 to satisfy litigation awards, and all costs associated with litigation, involving a centralized emission inspection contract with Envirotest.[3] Throughout the debate by the Senate, the members questioned the justification for the amount of the settlement and commented that the legislation should be voted down until the members had an opportunity to receive a more detailed explanation of the amount.[4] In response to the members' concerns, Senator Loeper offered certain figures that were verified to the Commonwealth by Ernst & Young.[5] Senate Legislative Journal, December 12, 1995. Senator Loeper stated that Ernst & Young audited or reviewed the material submitted by Envirotest in order to determine what Envirotest's actual costs were.[6]Id. Thus, it is clear from the legislative history that the report prepared by Ernst & Young was the justification for the approximately $145 million *335 dollars of public funds being expended to settle a public contract dispute with Envirotest. Accordingly, the report was an essential component of the decision to pay Envirotest.
There is an inherent responsibility of disclosure and the absolute duty of cooperation between the branches when inquiry is made by any member of the General Assembly with respect to obtaining a justification for the expenditure of public funds. When such an inquiry is made, it is mandatory for disclosure to occur. The Office of General Counsel, Executive Branch, is constitutionally obligated by implication to disclose the basis of the justification for any financial amounts requested from the General Assembly.
Notwithstanding a separate public contract with Envirotest, the report is part of the justification for the requested amount. This essential information must be provided to the General Assembly as the body authorizing the expenditure of the public funds. Otherwise, by withholding justifying reports from the knowledge of the other branch which of necessity must authorize such money, we would be permitting one branch to act in total or partial ignorance when voting which needless to say would subvert our representative form of government.
Herein, it is clear that the public and the members of the Senate still do not know the justification of the settlement with Envirotest. That is why the Petitioners are attempting to secure a copy of the Ernst & Young report under the Right to Know Act. For the foregoing reasons, I believe that said document is clearly a public record pursuant to the Right to Know Act. Accordingly, I would direct the Office of General Counsel to provide a copy of the subject Ernst & Young report to the Petitioners.
Judge FRIEDMAN joins.
NOTES
[1] Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §§ 66.1-66.4.
[2] Petitioners have filed the present action both as individuals and in their capacities as elected members of the Senate of Pennsylvania.
[3] See Section 10 of Act 72, Act of December 20, 1995, P.L. 655, 75 Pa.C.S. § 4706.1.
[4] This Court's review of decisions rendered under the Right-to-Know Act is limited to determining whether the denial of the request for information was for just and proper cause. Morning Call, Inc. v. Lower Saucon Township, 156 Pa.Cmwlth. 397, 627 A.2d 297 (1993).
[5] Although the decision in Sapp Roofing was a plurality decision, we note that the full Supreme Court in North Hills cited favorably to the reasoning employed in Sapp.
[6] Act of August 15, 1961, P.L. 987, as amended, 43 P.S. §§ 165-1-165-17.
[7] Our conclusion that the requested documents are not "public records" under the Right-to-Know Act precludes access by any "citizen of the Commonwealth of Pennsylvania," including Petitioners in their individual capacities. While Petitioners also allege that they are duly elected members of the Senate of Pennsylvania, they cite no authority that would accord them greater rights of access than would be accorded to any citizen. We note, however, that both the majority and minority chairpersons of the Senate and House Appropriations Committees have statutory rights to certain "budgetary data" in the possession of the Executive Branch. See Thornburgh v. Lewis, 504 Pa. 206, 470 A.2d 952 (1983); Section 620 of the Administrative Code of 1929, Act of April 9, 1979, P.L. 177, as amended, added by the Act of September 27, 1978, P.L. 775, as amended, 71 P.S. § 240. We express no opinion as to whether the type of information requested here would constitute "other budgetary data" within the meaning of Section 620.
[1] Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §§ 66.1-66.4.
[2] See Senate Legislative Journal, December 12, 1995.
[3] See Section 10 of Act 72, Act of December 20, 1995, P.L. 655, 75 Pa.C.S. § 4706.1.
[4] Senator O'Pake, in his remarks, stated as follows:

Secondly, last night, quite appropriately in the Committee on Appropriations, we asked for an explanation of where all this money was going. It seems to me that if we are being asked to, in effect, ratify litigation and the settlement of a lawsuit, the Members of this body, in order to intelligently vote ought to know why exactly $145 million, plus $15 million, plus interest, why that figure? And as the gentleman from Montgomery, Senator Tilghman, pointed out, he wanted the Governor to produce some specific information or they would be, in his words, derelict in their duty....
Today we got a very thick package, ... but we have no idea how much of that $145 million is gong to go to salaries for employees who either were hired or were about to be hired or were promised to be hired. We have no idea, although we have a list of properties that were allegedly bought, of the assessed valuation of what those properties will sell for or what they will cost. We really do not know a whole lot. We know the bottom-line figure. We know that somebody thought that $145 million was a way to get out of this lawsuit. I respectfully suggest that to intelligently vote to affirm this and support this, we need additional information.
Senator Porterfield in his remarks, stated as follows:
Mr. President, I have a few comments in regard to this payoff and/or proposal and what has basically happened to the people of Pennsylvania during the last several years. I will start off with my concerns in regard to the proposal to pay Envirotest X number of dollars, and not having information available pertaining to the costs that have been incurred by Envirotest as to whether the $145 million is proper or not, I do not know.
Senator Wagner, in his remarks, stated as follows:
But in reading the settlement and in reviewing the complaint that was filed, I find it to be very difficult to determine what the costs to Envirotest were up until the date when this agreement was terminated. And I think that is a question that needs to be answered tonight.
....
We have in front of us, as best as I can tell, and it is very difficult to tell, what we are going to spend at a minimum $145 million in taxpayer money as part of this settlement. I do not know how one penny out of that $145 million was determined.... [A]nd I have never seen an agreement put in front of me with so little information to verify or justify the settlement than the one we have in front of us tonight.
Senate Legislative Journal, December 12, 1995.
[5] It is clear from the Senate Legislative Journal of December 12, 1995, that Senator Loeper had access to the Ernst & Young report that is the subject of the present controversy.
[6] I note that the members of the House also had great concerns about the lack of disclosure and the fact that the members did not have a copy of the independent audit performed by Ernst & Young, For example, in his remarks, Mr. Kukovich stated as follows:

Until we see the independent audit by Ernst and Young  which I have not seen and I have only heard mentioned during Senate debate  until we find out what the details are and whether there have been appropriate appraisals of all the property involved and until we have an understanding as to whether or not Envirotest actually did what they should to mitigate their damages going back over a year ago.... I think until we get full disclosure, ..., we should not support this bill.
House Legislative Journal, December 13, 1995.